We'll hear the first case, New York Times v. Central Intelligence Agents. May it please the Court, my name is David McCraw. I represent the appellants. I'm joined by my colleagues Alameen Samar and Dana Green. Despite what you may have read in some newspapers, the New York Times and President Trump agree on one thing, and that is that the President has the absolute power to decide to disclose covert operations or classified information. The President made that clear just last week when he tweeted out a picture of an Iranian missile site. When he was asked about whether that was in fact a secret, he said, We had a photo and I released it, which I have the absolute right to do. That was August 30th. Can I bring you back to this case? How would you respond to the, it's in your briefs, but I would like to give you more of a chance to talk about it. Sure. How do you respond to the contention of the District Court and the CIA that the President's tweets could be interpreted to mean that the Washington Post invented a, and I quote, massive, wasteful and dangerous, close quote, program rather than describe an actual program that existed? I think that the tweet is ambiguous about one point, what he didn't like about the Washington Post story. I do not think it's ambiguous about the rest of it, and that is that there was a massive, dangerous and wasteful payment to Syrian rebels fighting Assad. And if there were any doubts about that, I think he dissipates those in his interview the next day with the Wall Street Journal. Admittedly, again, a little bit garbled, the Wall Street Journal decides to defend the New York Times honor. I will not disagree with them doing that. And so the flow of the thing is not particularly clear. But we find out that he says, It wasn't my decision. And the arms were going to the. Speak a little louder. I'm sorry. Yes. I didn't hear. Wasn't my position. Is that what you said? I said I said that the Wall Street, the flow of that interview gets interrupted because the president mistakes the New York Times for the Washington Post. The journal stands up for the times. But ultimately, we find out that that the president says two things. One is that it wasn't my decision. And second, that he says that the arms were going to al Qaeda. The thing that I would point out of the way I would think the analysis properly flows from the tweet is did some did anyone walk away? Any reasonable person walk away from that tweet and think there was not payments being made? He uses terms that do not appear in The Washington Post at all, that they're wasteful, that they're dangerous and they're massive. And in fact, the post argument, the post article, rather, is highly critical of the decision. It's quoting a lot of inside sources, experts, whomever, saying this program was important. The president takes that on. So I think as to whether there is a program, whether there are payments, the tweet is clear. The tweet nor the interview mentions the CIA, do they? That's correct. And I think that the other piece of that that's important is nor does our request. Our request does not ask for CIA payments or CIA programs. Who did you make the request to? We made it to the CIA. And so in many ways, this tracks the case ACLU versus CIA from the D.C. Circuit, where the circuit sets aside a Glomar response because the request only asks for whether there are documents which would show an interest in the intelligence operation, not whether the CIA was involved. There is a clear misstatement in the government's brief here when it says that we ask for CIA programs at the district court. That is not so. That what we said to the district court was, and I'm going to quote from our briefing, the request does not mention the CIA at all. As a result, the CIA's mere acknowledgment that it possesses documents pertaining to the program would show only that the CIA has an interest in U.S. efforts to assist Syrian rebels. Such acknowledgment would not reveal what the CIA claims is still secret, whether the CIA itself was operating the arms program. And we have a footnote that drives that point home again. Our request does not mention the CIA. And just as in ACLU versus CIA in the D.C. Circuit, this ‑‑ there's been a disclosure of a program. The CIA is being asked to do a very simple thing here, simply acknowledge documents. Simply acknowledge documents. We are putting off for another day whether we have any right to the content of those documents. But it's our position that under official acknowledgment, as it's been interpreted by this court and the D.C. Circuit and other courts, is that when the disclosure of documents, disclosing the existence of documents, just the existence, will not reveal a secret, they have waived Exemption 1 and Exemption 3. Which words in the tweet or in the interview, in your view, are the official disclosure? Yeah. Thank you, Your Honor. It seems to me that when the President says, my ending, massive, dangerous and wasteful payments to Syrian rebels fighting Assad, that is a direct statement acknowledging, officially acknowledging, that there is a program that involves those kind of payments. Full stop, whether we're ever entitled to any documents about this. But the way FOIA works is it begins by having the agency acknowledge that there are documents, so we can then make whatever arguments we have to try to get them. And I find this lines up very closely with the ACLU. Do you have anything about the ‑‑ after that, though, I mean, in terms of the Wall Street Journal interview? In the Wall Street Journal article, he makes two points. The President makes two points. One is he says, it wasn't my decision. The Washington Post had said it was. The Washington Post had portrayed the decision as being driven by concerns about the Russians. He said, it wasn't my decision. And he said, these weapons are going to al Qaeda. The significance of that is not only the disclosure, but had there been some erroneous disclosure in the tweet, had he not intended to do that, that would have been the time to make that clear. But instead, he doubles down and makes the point again. So I look at this as closely aligning with the ACLU case from the D.C. Circuit, where the disclosure of the documents would show nothing more than an intelligence interest, not whether the CIA operated, but an intelligence interest. What you're asking is really quite narrow. Very narrow. Now, with respect to the statements by General Thomas, can this case be resolved without reference to those statements? It can. It absolutely can. I think when I look at General Thomas' statements, I think there are two points of relevance about it. One is that it undermines whether it's logical and plausible for the CIA to say there's a great secret here. The other thing is that it also suggests to me General Thomas, a serious, high-level military officer, obviously knows what would harm national security. He made those statements at a very public forum. New York Times reporters were there. Academics were there. Others in the intelligence community were there. And he obviously understood that by making those statements, however broad or however narrow the disclosure, was that he did not imperil national security. That's exactly our point here, that acknowledging documents wouldn't either. Is there anything in the record that suggests that General Thomas had any role with respect to this program, that he had any oversight with respect to this program? There is no evidence that he had any oversight. He was speaking as a high-ranking Department of Defense official. Might he not have just gotten the information that he talks about from these various press articles? It's possible. I'm sorry, is it from the various press reports? Press reports. Yes. Not based upon any activities. I think he is asked about the press report. Judge Walker, I think he's asked about the press report, so he's clearly speaking to those. But he does talk about where the decision-making lay. That may be. But as I understand it, official public disclosure requires an authorization on the part of the individual to make the disclosure. And if a person is doing it based upon and is so authorized, then that's fine. But if he's not and if he's just parroting what he read, then that wouldn't count. I take your point. Parroting what he read and commenting on it. I take your point. When I look at his comments, they seem to go beyond simply referring to what had been published. And I think it goes to a separate doctrine, which we have in Flores v. CIA, that do those disclosures create an implausible and illogical situation where the CIA's response simply doesn't meet the standards of what the court would require. But in any case, just so I understand your position, this case can be resolved without reference or reliance on General Thomas' statements. I see General Thomas' as an extra add-on on the analysis of plausible and logical. Thank you, Your Honor. Thank you. Good morning, Your Honors. May it please the Court, my name is Jeanette Fargus and I represent the government in this action. Could I bring you close to the language of the tweets? Yes, Your Honor. And if you could help me understand all this. As I read what the Washington Post article says, the Washington Post article does not describe the payments as massive, quote-unquote, or dangerous, quote-unquote. Only the President does. And the article itself can largely be understood as a critique of ending the program. So help me understand what's going on from your point of view. Given the words massive or dangerous seem to be just the President's, they are not the Washington Post's. And in context, the article itself is not saying that this is a massive or dangerous program. Your Honor, those words don't appear in the Washington Post article, but that doesn't mean that they couldn't be the President's characterization of what is described in that article. This is a one-sentence tweet in which the President affirmatively says nothing. He does not say that the United States operated a covert action program to fund and train Syrian rebels. It certainly doesn't say that the CIA operated such a program. It simply says that the Washington Post fabricated the facts. Now, what they fabricated the facts on, he's unclear about. But it's certainly not sufficient under the Wilson test, the requirements of specificity and matching, to say that this one-sentence tweet, which merely challenges the veracity of a news article, is sufficient to publicly and officially acknowledge the existence of a covert action within the meaning of the National Security Act. It doesn't — I think what's notable is what he does not say. As Your Honor has noted, he doesn't mention the CIA. You would like to simply stop the analysis with the words fabricated the facts, period. Because once you get into my ending, a massive dangerous — the massive dangerous and wasteful payments to Syrian rebels, it seems to me under those circumstances that has to be based on something other than — for you to — for you to succeed here on something other than the President's own words. If those words are ascribed to the President, then it seems to me you have a problem. Your Honor — They're ascribed to the President's making a statement that is not, you know, that is not — that is based on something. I mean, you know, I suppose the President could have said anything, but it doesn't — isn't there a common-sense reading here that ending — my ending, massive dangerous and wasteful payments is — gets to the reasons why the program was ended? It's certainly a reading, but the question is whether it's an unambiguous and the only meaning. Because as long as there's any level of ambiguity — What's the other point of ambiguity? As the district court found, one could also read this as his characterization of what was described in the Washington Post article, rather than him acknowledging that he ended payments to Syrian rebels, particularly because the lead-in to the sentence is that it's the Washington Post fabricated the facts. So there's — the New York Times has two problems. One is there — this is too general a statement to — under the Wilson test. It doesn't mention a CIA covert action program to fund and train Syrian rebels. You have to read two or three layers of meaning within it to possibly get to that reading. But it's certainly, at any point, ambiguous. And it doesn't mention the CIA specifically. And that alone, as the district court held, is a separate and independent reason for the affirmance of the district court's decision. Now, Mr. McCraw just said — Basically, it comes down to the question of how precise and specific does the statement have to be. And, you know, reasonable people can differ on that — on what that is. I mean, but — so that's — you know, I mean, I think you would — you would say that, you know, there needs to be more specificity in terms of the actual disclosure of the program explicitly, as opposed to something that could — could lead to that as a plausible inference. I think that's what this Court's precedents require, particularly if you look at cases like Willner, cases like Wilson, and the D.C. Circuit's line of cases like Asher and Wolf, Larson. They all require — they emphasize the need for exactitude because this is — the official acknowledgment doctrine is essentially a judicial creation that waives national security protections. And because that's — national security harms are so vital to the — to the national interest, they're not lightly inferred based on general statements. If there's even a little bit of variance, then courts have said that's not sufficient to be an official acknowledgment. That's why courts, for example, the line of cases that say if a — there's been official acknowledgment of a CIA overseas station in 1973, that doesn't mean they've acknowledged the existence of such an overseas station in 1972 or 1974. It's confined to the exact contours of the edition. I take your — your statement of the law, and I think there are good and sound reasons why we should be very concerned about doing anything that impairs national security. And that's what our doctrines are trying to — to do. And sure. But my problem is that if you look at the way — what the president said about the Washington Post article, and you then look at what he said in the Wall Street Journal interview, it seems that he is acknowledging a program. Let's look at the Wall Street Journal interview. Yes. It seems to me that — and help me understand where I'm misunderstanding — that the decision, quote, unquote, that he alludes to was the decision to end the aid program. And when he said, and I quote, there's a lot of al Qaeda we're giving these weapons to, that was about the weapons supplied through the program at issue ending up in al Qaeda's hands. What else could he have had in mind? Your Honor, he could have had in mind a DOD program that's publicly acknowledged to fund and train Syrian rebels. He could have had in mind a program that's not a CIA covert program. He could have had in mind — we don't know. That's the problem here. When you compare this to the type of statements where official acknowledgement has been found, in each of those cases, there's been a direct statement of the classified information into the public record. You didn't have to infer it. You didn't have to guess it. You didn't have to speculate. And that's the reason why the case law says you can't have official acknowledgement by speculation. It can't be the public guesses that this is what must be the case. It has to be direct and unambiguous. And here, we don't know what the decision was. It was a decision made by people, not me. That's what he acknowledged. But he doesn't say what decision it was. He doesn't say who made the decision. He doesn't say what the decision was regarding. He doesn't say if it was the CIA program or some other type of program. What's the rationale for continuing to admit or deny the existence of a program from a national security perspective after making comments like this that seem to indicate that something exists and we can debate the specificity of it? But what's the rationale for the Glomar response? Your Honor, the rationale is explained both in the public declarations but also in more detail than we could provide in the public declarations and the classified declaration that goes into some detail about the national security harm that would come from the CIA being forced to either confirm or deny the existence of records regarding such a program. I can't comment further. The general answer is to the reasons that it might. I mean, I'm not asking for specific, you know, programmatic details. I'm asking about, you know, from a national security perspective, is there a benefit, generally speaking, of being able to deny the existence of something that, you know, it seems like we're all talking about? Yes, Your Honor.  And our declarations ---- Without speaking to anything classified, can you be more specific as to the benefit in terms of how it could harm national security? So let me answer that question in twofold way, one of which is reference to the declarations and one of which is to reference to this Court's case law. First of all, in our public declarations, we describe how the type of program that's These, by definition, it's a defined term within the National Security Act, is a type of activity by the United States government to influence political, economic, or military conditions abroad, but specifically in such a way that the role of the United States government is not apparent or publicly acknowledged, and that there have to be supported by a presidential determination that this kind of covert activity is important to the national security and that it's important that it be done in this covert manner. So by definition, by statutory definition, covert actions, the revelation of them, harms national security. And I also note that the covert actions are explicitly listed as a ---- You want to blank check? Pardon me, Your Honor? You want to blank check? Anything that's conceivably covert in your view that could be labeled covert is off the table? No, Your Honor. Covert action is a specific defined term in the statute. It has ---- They have a procedure that has to be followed in order to activate a covert action. They're subject to specific statutory congressional oversight. They have a definition that's beyond just normal covert activities of the CIA or other agencies. It's a very specific type of activity, as I said. Here's my problem that you can help me with. As I understand it, if your adversary succeeds, there are no documents, there's nothing that's released at this stage. It's simply a question of whether what the President said is an acknowledgement or not. But what flows from that, it seems to me, is quite likely that nothing will be released in the next round, because if you are correct, then that would impair national security. So what is it that you're losing in terms of national security in the context of this litigation? Your Honor, if the GLOMAR is overturned, then the CIA would be forced to be put in a position to confirm or deny the existence of records, which in this case is tantamount to acknowledging whether or not it conducted such a program. And so that is the harm, that this program was actually conducted. Does it have to say it conducted the program, or does it ---- Is it just an acknowledgement that a program exists? In this litigation, and I think that Mr. McGraw somewhat mischaracterized the litigation posture, the way this was litigated was that it was a CIA-operated program. And let me ---- perhaps it requires a little bit of history, but the CIA, when it responded in the district court, said that there's ambiguity regarding the request because it refers to a program, the tweet doesn't refer to a program, but it does refer to a Washington Post article that describes a program. So we are interpreting your request as being about the covert CIA program described in this Washington Post article to fund and train Syrian rebels. When the New York Times cross-moved for summary judgment and filed its opposition to our motion for summary judgment, it said that the CIA had correctly assumed that they were seeking the records about the CIA covert program and in fact uses the words covert program and CIA program throughout its papers. It's only, and this is the papers that Mr. McGraw referred to, in a footnote in a reply brief after the government's briefing had been done, that they then said, well, it could be any agency. Clearly, the district court understood that this was litigated and on the basis of covert CIA program. That's how it begins its opinion. He says the question and issue in this case is whether or not a covert CIA program has been acknowledged. And one of the two bases for his decision that it had not been officially acknowledged was even if a covert program could be said to be acknowledged by these president's statements, which he found that they hadn't been, as a separate and independent basis, it certainly doesn't mention the CIA. And the CIA's papers mention as a separate independent harm why the CIA's involvement in such a program is classified if such a program existed and why it would harm national security because it would reveal the CIA's capabilities, intelligence, interests, relationships, and activities abroad. So that was a separate and independent reason, which can also sustain this court's findings on appeal. How would you respond to the view that General Thomas's statements undermine the sense of any doubt about the existence of the program? Your Honor, we think that General Thomas's statements don't even qualify as relevant under the Flores test because it does not appear that these were an official acknowledgment on the part of DOD. They were an answer by the general at a private forum in response to a question. It does not appear that he was authorized by DOD to make this release or speak to this issue. And, in fact, all of the characteristics of the statement itself suggest that he's not speaking at least from definite knowledge. He uses phrases, at least from what I know, I don't know enough about it, I'm reading the editorials, it might have been, perhaps. None of that sounds definitive. It certainly does not, is not so definitive that it could possibly undermine the logic and plausibility of the CIA's glomer. I would compare this, for example, to the Wilson case again, in which there was an actual letter on CIA letterhead that the CIA had acknowledged that had been sent from it. It was in the congressional record. And this Court emphasized that because it had not been an official acknowledgment by the CIA in that case, that lingering doubt, that a possibility for plausible deniability was sufficient to allow the CIA to maintain the classification of that information because there was a logic to saying that an official acknowledgment requiring the agency to say yes, those were Ms. Wilson's dates of service, could be enough to cause a national security harm. And here we have much more than a lingering doubt. Your position is that he was roughly the equivalent of a hired talking head who might come on to comment on something that was in the news. Your Honor, I certainly — General Thomas was working for DOD, so I wouldn't say he was— He was working for DOD, but he — but there's no — I gather you're taking the position that there's no reason to think that he had direct knowledge of this. Absolutely. And he might have picked it up based upon outside sources and editorials and articles and that kind of thing. If anything, his own comments seem to disavow him having direct knowledge. The fact that he says, I don't know enough about it, and at least from what I know, doesn't sound like someone who was directly involved in anything. And it certainly does not speak to the kind of statement one would expect. If this was authorized on behalf of DOD to acknowledge a classified covert program, you would not expect a high-level official to use those type of words. He doesn't say, however, that he doesn't know anything about the program. He says that he's talking about to the extent that he knows something. Yes. So it's almost implicitly acknowledging that there is a program. But what the specifics are, because he's not deeply involved, he can't say. So it's not simply — it's not that he is disavowing the existence of the program or saying that there's nothing to it. He's being, in a sense, careful to say, I will only speak to what I know. Now, at the same time, I take your point that, you know, he is not involved in the oversight. He doesn't have — he may not have direct knowledge of the program. So our point is twofold, one of which, it doesn't seem as if he was authorized to make that statement. And whatever his high-level position is, if he's not authorized to make the statement on behalf of DOD, it's not an official acknowledgment, and it doesn't qualify under Flores. Second, that whatever — there's certainly ambiguity after one reads the statement as to how much he knew, what he knew, and where he got that information. Was it from reading editorials and news articles of the type that he alludes to? Is he speaking from personal knowledge? There is a lingering doubt, more than a lingering doubt, and under Wilson, that is enough. Thank you. Thank you. Roberts. I have one, if I could ask one, going back to the Trump statements. So this case seems to boil down to whether or not you can — what inferences are permissible and whether competing inferences that are weaker defeat the Times' position. And I take it's your position that an ambiguity can be created even if it's a 2 percent likelihood, as opposed to the other 98 percent likelihood. Is that — is that — is that your position? Absolutely, Your Honor. That is our position, because that is what the Wilson case stands for. It stands for the proposition that if there's any ambiguity, that is the lingering doubt that the Wilson court referred to. It gives the agency plausible deniability. It allows the agency to say, regardless of what the public perception is, or what public speculation or public reporting or what everyone thinks they know, in the — in the field of foreign relations and national security, that level of being able to say, no, no, we didn't — we didn't say that. We — you know, that's not what it means, is very valuable. And there's a national security benefit to being able to maintain that level of deniability. And that's what various courts have recognized. But I do emphasize the Wilson case in particular. And the matching and specificity test is not met when there's an ambiguous statement. I would — I would have an easier time with this situation, I think, if let's say it were a press conference and there was back and forth and some language was not as precise as it should be.  And something is being communicated, and the language about massive, dangerous and wasteful payments is the president's. It's not the Washington Post's. And that's the problem that I have. And then in conjunction with the Wall Street Journal interview, that's the — that's the — that's the problem. I think, again, it comes down to what was communicated. The one-sentence tweet was led with — it was a fabrication. And so there's — everything that comes after that has to be read with that verb. That is the verb. They fabricated the facts. And so it's not an — it is a statement, but it's not an affirmative statement. I would dispute that characterization of the tweet. Secondly, with respect to the Washington — It is an affirmative statement. It's a denial. It's a criticism of the Washington Post, but it's not a direct statement affirming the existence of a program. With the Wall Street Journal article, he refers to a decision made by people, not me. That could not be vaguer. It could not be more ambiguous. A decision doesn't say the decision. It doesn't say the decision talked about in the Washington Post article. It doesn't say that program. But he begins by saying it was in the Washington Post. He says — That's where he begins. Yes. But he doesn't say a decision as described in the Washington Post. They got it right. He says — No, he said it was in the Washington Post. That was not something I was involved in, other than they did comment and they suggested. It turns out it's a lot of Al-Qaeda we're giving these weapons to. You know they didn't write the whole — they didn't write the truthful story, which they never do. Again — So all of those things are very important. I'm just — I understand your position, but — Yes, but again — You're in a difficult position, I understand. He disputes the veracity of the Washington Post article in both the Wall Street Journal article and in the tweet. But if nothing else — Do you read the Wall Street — do you read the Washington Post article as critical of the decision to end this program? I think the Washington Post article is — expresses that it was a controversial program to the extent it existed. I'm just describing what the Washington Post article says about this topic, that there were those who held competing viewpoints about its — whether it was effective, whether or not it should be continued. But the point is the president certainly can characterize it however he wants. He's entitled to read it and have a viewpoint on that article, and that's not an official acknowledgment that the article is truthful absent him affirmatively stating as such. Thank you, Your Honors. The Court has covered the many issues here, and I thank you for that. I simply want to go back to this question about what we argued to the district court. The government says in its brief on page 25 that we never argued that non-CIA programs came within the ambit of the request. The government has now conceded that, in fact, we did. We made that argument in January, six months before the decision. If they felt that we had somehow misrepresented the record, they had plenty of time to tell the district court that. In fact, what we did there was we said not only in a footnote but in the text of our brief that we are not asking for CIA-specific programs. That, I think, is crucial because acknowledging documents just in ACLU versus CIA might show, would show, an intelligence interest by the CIA but not an intelligence program that they operated. What's your response to the government's argument, and this Court's holding in Wilson, lingering doubt is enough that there's a national security value to that? I would point the Court to the decision in New York Times versus DOJ, and it's clear that while the Court talks about Wilson and specificity and matching, it actually acts on a much lower standard than exactitude, as Ms. Vargas is suggesting. In that case, in New York Times versus DOJ, there were no disclosures about one particular statute dealing with murder abroad, and this Court found that that should be released as well, even though there was not only an inexact match but no match. So I think if you look at that decision, it's asking that you make a reasonable reading of the tweet and of the Wall Street Journal article, and then looking at what would acknowledging documents do, and I think that you will see a complete match. There is an acknowledgment of payments, and the CIA saying it has documents acknowledges it has documents about payments. If let's say there's, going back to Judge Walker's question, if there's some lingering doubt, and also Judge Park's question, if there's some lingering doubt, even if it's 2 percent, is that enough? When the President says it, I do not believe 2 percent is enough, no. I believe that the fact that the test is whether what reasonable readers would come away from that presidential statement, and I never got around to really answering Judge Park's question, so let me do so. Plausible deniability makes a lot of sense. If you read in the New York Times today, there's a classified program, and everybody in the world knows the New York Times is telling the truth, and there's a classified program, and the government says we're not going to give you any documents because it's not been officially acknowledged. That's plausible deniability. Just to be clear, I think there's a difference between plausible deniability and lingering doubt. I mean, I don't know sort of where they fall in the realm of clear and convincing and things like that, but plausible maybe, maybe not, but lingering doubt seems very low in terms of what needs to be done. It sort of goes to the exactitude and certainty that you were talking about earlier. I think it also goes to where the statement is being made, what level of authority. In this case, it was the President. It was a President who was speaking directly to the public. It was not some obscure reference in a congressional testimony from 1948, as one case held was enough. And so the ‑‑ You're saying basically there can never be a lingering doubt as to anything this President says? Your Honor, I'm not going to go into the back. Paragon of truthfulness. Your client has not always taken that position. What I would say is that the test is what would a reasonable reader take away from that. Right. But what would a reasonable reader take away from that in light of the speaker and the speaker's ability to speak, desire to speak off the cuff about things generally? I mean, isn't there some play in the joints there? I wouldn't dispute that. In fact, there may be some play in the joints in other statements. I don't see that here because this was a planned release to millions of people. This was an attempt for the public to ‑‑ sorry, for the President to talk directly to the public. They need to know about this. And I understand the CIA would prefer to be the old traditional system where they would get asked, is it okay if I tweet about this? But they're not the President. The President gets to decide. So the question of if there's a little doubt, I don't think that's enough, unless it's a doubt that a reasonable reader of that tweet would come away with. If there are no further questions, I thank your honors for your attention today. Do you think it's possible that if your position were to prevail, that that might encourage more careful tweeting? I was about to use the word unintended consequences. I won't. It may well. If tweets are going to become the way presidents in the future, and I think it will be communicated, every Republican, every Democrat has one now, I do think, in fact, that they should treat them as official statements because that's what they are. Thank you, your honors. Thank you both for your excellent arguments. Very much appreciate your presentations. The court will reserve decision.